

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00086-CR

_____

BRANDON DALE WOODRUFF, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court No. 23,319

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

OPINION

Dennis and Norma Woodruff, parents of Brandon Dale Woodruff, were murdered in their manufactured home in Royse City, Texas, on October 16, 2005. Both Dennis and Norma died as a result of gunshot wounds and multiple stab wounds. Brandon was soon arrested for their murders. While Brandon was in jail awaiting trial, the Hunt County District Attorney's Office instructed the Hunt County Sheriff's Office to record Brandon's conversations with his attorneys and provide the district attorney's office with copies of the recordings. The Texas Attorney General's Office agreed to prosecute the case after the Hunt County District Attorney's Office recused. Prior to trial, Brandon filed a motion to suppress a statement he had given to the police, which the trial court denied. A jury found Brandon guilty of capital murder, and an automatic life sentence was assessed.

Brandon raises five issues on appeal. He argues that the evidence is legally and factually insufficient, that the trial court erred in denying his motion to dismiss, that the trial court erred in refusing to permit questioning of a Hunt County assistant district attorney, and that the trial court erred in denying the motion to suppress Brandon's statement. Because the evidence is sufficient and the trial court did not err in refusing to dismiss the indictment, refusing to permit the questioning of the Hunt County assistant district attorney, or denying Brandon's motion to suppress, we affirm.

2

## I. The Evidence Is Sufficient under *Jackson v. Virginia*

In his brief, Brandon argues the evidence is legally and factually insufficient.[1] The State was obligated to prove, beyond a reasonable doubt, Brandon intentionally or knowingly caused the death of Norma and Dennis during the same criminal transaction. TEX. PENAL CODE ANN. §§ 19.02, 19.03(a)(7)(A) (Vernon 2003 & Supp. 2010). In reviewing the evidence for sufficiency, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). In the *Brooks* plurality opinion, the Texas Court of Criminal Appeals found "no meaningful distinction between the *Jackson v. Virginia* legal-sufficiency standard and the *Clewis*[2] factual-sufficiency standard, and these two standards have become indistinguishable." *Brooks*, 2010 WL 3894613, at *8. In a concurring opinion, Judge Cochran pointed out that the United States Supreme Court has rejected a legal sufficiency test that requires a finding that "no evidence" supports the verdict because it affords inadequate protection against potential misapplication of the "reasonable doubt" standard in

---

[1] With Judge Cochran joining the lead opinion, authoring a concurring opinion and Judge Womack concurring with the lead opinion and joining the concurrence, in *Brooks v. State*, No. PD-0210-09, 2010 WL 3894613, at **1, 14 (Tex. Crim. App. Oct. 6, 2010) (4-1-4 decision), a plurality of the Texas Court of Criminal Appeals abolished the factual sufficiency review established by *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), and its progeny. The plurality and Judge Womack agreed that the *Jackson v. Virginia* legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks*, 2010 WL 3894613, at **1, 14. Since the Texas Court of Criminal Appeals has abolished factual sufficiency review, we need not address the defendant's challenge(s) to the factual sufficiency of the evidence.

[2] *Clewis*, 922 S.W.2d 126.

criminal cases. *Id.* at *16 (Cochran, J., concurring). Rather than meeting a mere "no evidence" test, legal sufficiency is judged not by the quantity of evidence, but by the quality of the evidence and the level of certainty it engenders in the fact-finder's mind. *Id.* at *17. Sufficiency of the evidence claims are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

### A. The Circumstantial Evidence of Guilt

#### 1. The Crime Scene

Charla Woodruff, Brandon's sister, attempted to contact Dennis and Norma by telephone when she reached her college apartment at 11:00 p.m. on the night of the murders.[3] Several other family members, including Brandon, attempted to contact Dennis and Norma. The following day, the police were requested to conduct a welfare check. Although no one responded to the police officers, the police did not force entry into the residence. At the request of Linda Matthews, Brandon's aunt, Todd Williams forced entry into the residence and discovered the deceased.

The crime scene indicated Dennis and Norma were killed without a significant struggle. They were sitting next to each other on their living room couch, covered in blood, and obviously dead. Dennis' spit cup was still in his hand. Norma was found seated facing her husband, and the police theorized that Norma may have been attempting to duck behind her husband. The crime scene investigation did not reveal any signs of forced entry, any signs of a struggle, or any signs the

---

[3]Cell phone records verified this call was made from a cell tower in Magnolia, Arkansas.

house had been ransacked. Investigator Tommy Grandfield testified he did not believe the position of the bodies was suggestive that the victims had been taken by surprise. The wallets of Dennis and Norma were missing, but many valuables, including a handgun, a computer, jewelry, and appliances remained.

The police noted blood droplets in front of the couch and a trail of blood droplets leading from the couch toward the guest bathroom and bedroom. Neal Martin, a crime scene investigator with the nearby Smith County Sheriff's Office, testified the blood droplets in front of the couch and the trail of blood droplets were the result of "passive blood flow" or simply free-falling blood." There were hairs in the bathtub of the guest bathroom that were very dark with light roots.[4] The scene also contained blood stains on mini-blinds behind the couch, which were most likely caused by a high-velocity impact, such as a gunshot wound. No shells were discovered at the scene, which suggested the murderer either used a revolver or had picked up the casings before he left. Due to the soot and stippling, Dr. Sheila Spotswood, the pathologist who performed Norma's autopsy, testified the murderer discharged the firearm at less than twelve inches from Norma.

During the autopsy, large caliber bullets were removed from Norma's neck and from Dennis' cervical vertebrae. Norma died from five gunshot wounds[5] and a four-inch-deep stab

---

[4]At the time of the murders, Brandon had dark hair. Brandon's natural hair color, though, was blond.

[5]Four of the gunshot wounds occurred to the face and neck. One of the gunshot wounds entered through the back of Norma's hand. Dr. Spotswood opined that the wound probably occurred when Norma covered her face with her hand.

wound across her neck. Dennis died from a gunshot wound to the face and nine stab wounds to his face, neck, and chest.

### 2. Brandon's Dagger Was Found with His Dad's Blood on It

Brandon had been attending Abilene Christian University and had kept a dagger in his dormitory room.[6] When the room was searched after the murders, the police did not discover the dagger. Kathy Lach, Brandon's aunt, discovered the dagger in the barn at Dennis and Norma's residence in Heath, Texas,[7] two and a half years after the murders. The dagger was approximately sixteen to eighteen inches long with a twelve-inch blade. Eric Gentry admitted he had previously told the Texas Rangers that the knife blade of Brandon's dagger was only about six inches long, but testified he was absolutely certain the dagger introduced into evidence was Brandon's. A spot of Dennis' blood was discovered under a skull located on the guard of the knife.

Although the police searched the barn after the murders, they did not find the dagger. Approximately ten days after the murders, the police, with the consent of Charla, searched the Heath house. Grandfield testified that they "looked everywhere," including underneath the house. Charla testified the barn at the Heath house contained items which were moved from a prior residence and never unpacked, as well as items that had piled up over the years. Investigator Joel

---

[6]Eric Gentry, Brandon's roommate, testified his mother had informed Brandon the dagger probably violated ACU's rules and admitted Brandon could have taken the dagger home.

[7]At the time of the murders, Norma and Dennis were in the process of moving from their prior residence in Heath, Texas, to a manufactured home in Royse City, Texas. The move was intended to decrease expenses. Many items belonging to Norma and Dennis were still at the Heath house.

Gibson conceded that the dagger could have been placed in the barn by someone other than Brandon. The barn was not locked until years after the murders. After the murders, but before the discovery of the dagger, the barn had been cleaned out and items from the Heath house were stored in it.

The State's expert was unable to testify the dagger was the murder weapon, but testified the dagger "would be consistent with all the wounds." The State's expert admitted the wounds might have been caused by a kitchen knife.

Dr. Joy Carter, former chief medical examiner for Washington, D.C., and for Harris County, Texas, testified for the defense and criticized the autopsy. Carter testified, among other complaints, that the examiners failed to compress the wounds to determine whether the edges were consistent with a blunt-edged knife or a sharp-edged knife. Carter testified the majority of stab wounds are committed with a knife with one blunt edge and one sharp edge, rather than a knife with two sharp edges. Carter opined, after examining the autopsy files, that the wounds in this case were caused by a knife with one blunt edge and one sharp edge. She also opined that two knives were used because some of the wounds were rectangular. Carter believed some of the wounds had abrasions which indicated the knife was driven into the body until the knife guard made contact with the skin. The deepest stab wound was five and three-fourths of an inch deep. Thus, Brandon's dagger, which had a twelve-inch blade, could not have been driven into the wound

7

to the guard. Because Brandon's dagger had two sharp edges and a twelve-inch blade, much longer than the deepest wound, Carter testified Brandon's dagger was not the murder weapon.

While Carter's testimony is strong evidence contrary to the jury's verdict, it is the jury's duty to weigh the testimony and resolve conflicting testimony; a rational person could have rejected Carter's testimony. Carter only examined pictures of the deceased and the proper tests were not performed to determine if the murder weapon had a single blade or a double blade.

### 3. Activities on the Night of the Murders

On the night of the murders, Brandon left the Royse City house, proceeded to the Heath house, and then picked up Robert Martinez at a Denny's in North Dallas.[8] After picking up Martinez, Brandon went to the house of Alex Rulli, his boyfriend, and ultimately to a gay club in Dallas, Texas. Martinez testified that Brandon was originally supposed to pick him up at Martinez's girlfriend's residence in Denton around six o'clock. Martinez called Brandon multiple times on the night of the murders. During one of these conversations, Brandon was breathing heavily. Eventually, Martinez's girlfriend drove Martinez to a Denny's restaurant in north Dallas, where Brandon eventually met them, claiming he had gotten lost. Brandon showed up to meet Martinez without a shirt or shoes. Martinez testified he had never seen Brandon without a shirt or

---

[8]The State argues Brandon called Martinez in an attempt to get their stories straight. Martinez testified Brandon suggested he should remember that they met up at 9:30 p.m. On cross, Martinez admitted he did not know what time they met and had conferred with his girlfriend about the time. Martinez admitted he had claimed they had met at 9:30 p.m. for three and a half years.

shoes.[9]  When Brandon met up with Martinez, he asked Martinez if he would mind going to a gay club with him.  Although they had planned to return to Abilene, Martinez agreed.  On the way home from the club, Brandon got angry at his friends for going through his clothes bag.[10]  Rulli and James Britt attributed this behavior to a desire to keep details about Brandon's gay life from Martinez.

### 4.  Brandon's Lies and Suspicious Behaviors

The State presented evidence that Brandon had lied several times.  It is argued that these lies were evidence of guilt.  A summary of the most persuasive lies follows.

The State proved Brandon lied about the times he did certain activities on the night of the murders and lied about his parents purchasing him a new truck.  Brandon truthfully told the police where he was on the night of the murders, but he lied about the hour.  In an interview with Television News 11, Brandon repeated the time of day he took certain actions.[11]  In the News 11 interview, Brandon clearly asserted he left the Royse City house before dark.  Ranger Jeffery Collins, though, admitted the other teenagers he questioned in this case were also incorrect about

---

[9]Tamera Keel testified, though, that Brandon would frequently not wear a shirt or shoes when riding horses and that she was "always constantly telling him to put his shirt on."

[10]The State argued Brandon may have had evidence of the murder in the bag.  After he heard of his parents' deaths, Brandon asked to borrow his roommate's bag.  Eric Gentry, Brandon's roommate, testified he does not remember Brandon ever asking to borrow a bag prior to the murders.  Brandon's suitcase was seized by the police.  Ranger Jeffery Collins testified the tests on the suitcase for blood and gunshot residue were negative.

[11]In a news interview introduced into evidence, Brandon states that he left the Royse City house around 7:30 p.m., at the latest, that he left the Royse City house before dark, and that he went to the Heath house to feed their animals, including two dogs, two cats, and a bird, and estimated it would take him between thirty and forty-five minutes to feed the animals.

9

the correct hour of activities. Collins also conceded that Brandon was truthful about a number of things.

On several occasions prior to the murders, Brandon had told several friends at ACU that his parents were going to give him a newer truck and that he would be bringing the truck back with him. When he failed to return with a newer truck on previous trips, Brandon explained his dad did not want him to have the truck at ACU. Brandon returned to ACU on the morning after the murders with Norma's truck. When asked about the truck, Brandon responded that his dad did not want him to have it, "but that he brought it back with him anyway."[12]

Matthews testified Brandon had told her after learning of his parents' deaths that he had never fired a gun. Michelle Lee testified Brandon had fired a shotgun while he was at her house, but it was apparent that Brandon was not comfortable with guns.

Several witnesses testified Brandon had given them the impression that his family was wealthy. This perception was aided by Brandon's lavish spending habits. Brandon had told a couple of friends that his parents were moving to a bigger home[13] in Royse City, Texas. In fact, Dennis and Norma had close to $300,000.00 of debt and were moving into a double-wide manufactured home to cut down on expenses.[14]

---

[12]In the news interview, Brandon claimed he had permission to drive Norma's truck and claimed he "normally drives the truck."

[13]As pointed out by the defense, the Royse City house had more land and, therefore, the amount of land could explain this lie.

[14]In addition to being less expensive, the Royse City manufactured home also had more land to allow Norma to stop

The State also presented some evidence Brandon behaved suspiciously. Gentry testified Brandon speculated the death of his parents was not an accident before they learned the details of his parents' deaths. Pam Hoffman, the hairdresser who dyed Brandon's hair before the funeral, testified Brandon talked about his modeling activities and money the entire time he was getting his hair dyed. Hoffman also testified that Brandon claimed to have his dad's credit card and was planning on going shopping after they finished.[15] At the time of the arrest, Brandon had his parents' debit card on him. The fact that Brandon had his parents' debit card, while not ordinarily suspicious for a teenager to have his parents' debit card,[16] is suspicious due to the family tensions regarding spending habits.

### 5. The Jailhouse Informant

William Pardun, an inmate at the jail where Brandon was held pending trial, testified Brandon had asked how long a gun with a wooden handle would stay submerged and if it would float. Pardun, who had pending DWI charges, denied receiving anything in exchange for his testimony. On cross-examination, Pardun admitted he was angry at Brandon because he believed Brandon "kited me up" and got Pardun removed from the "medical tank." Pardun also admitted he

---

boarding her horses.

[15]Hoffman testified Charla collapsed at J.C. Penney and Brandon did not act concerned and asked her to finish his hair. Charla, however, testified she did not collapse at the mall. Further, Hoffman admitted that she had already made up her mind that Brandon was guilty.

[16]Charla, Brandon's older sister, testified her parents had given her a credit card to use for gas.

11

was currently on five years' community supervision for felony possession of a controlled substance in Rockwall County, despite an extensive criminal history, including four prior felony convictions.

## B.    Opportunity—Access to a Missing Gun

Shortly after the murders, the parents of Morgan Lee, Brandon's girlfriend, noticed an old Western-style revolver was missing from their home.   Bullets had been removed from the holster loops, and several of the holster bullet loops had been torn.   Michelle Lee, Morgan's mother, and Morgan both admitted they could not be certain how long the gun had been missing.   The evidence showed that Brandon could have stolen the gun while taking a shower at Morgan's residence the day before the murders.[17]   The evidence suggests that the missing gun might have been the murder weapon and that Brandon might have stolen it.

The State introduced evidence which created a strong suspicion that the missing gun was the murder weapon.   The gun used in the murders was never recovered.   Ballistics testing could not determine if more than one gun had been used.   Dennis and Norma were killed by large caliber bullets.   The missing gun was a .45 caliber revolver, and a .45 caliber bullet would qualify as a large caliber bullet.   Charles Clow testified the bullets removed from Norma and Dennis were cast lead bullets,[18] which are normally used in reloading bullets by hand and are called "cowboy

---

[17]Brandon had driven Morgan to Waco the day before the murders and helped her purchase a lamb.   After returning, Brandon and Morgan both took showers at Morgan's house.   Brandon took a shower upstairs next to the room where the gun was kept, and Morgan took a shower downstairs.

[18]Most factory bullets are produced by lead wire instead of being cast.   Clow testified, though, that you can purchase cast lead bullets.

12

loads." Mike Lee, Morgan's father, informed Ranger Collins that he had loaded the ammunition for the missing gun. The State, though, has not directed this Court to where there is evidence that Mike used cast lead bullets. The State's expert testified the bullets were fired from a gun with six lands and a right twist configuration, which is used by at least two manufacturers—Yeager and Ruger. The State, though, has not directed this Court to where there is evidence in the record concerning what company manufactured the missing gun.

Robert Fazio, the defense's ballistics expert, criticized the State's expert for not measuring the bullets removed from the deceased. Fazio testified six land and groove impressions with a right twist is a common characteristic that is used by many manufacturers. On cross-examination, Fazio admitted the bullets recovered from the deceased have the same characteristics as the bullets provided by the Lees and could not name any additional manufacturers of guns with six land and groove impressions with a right twist.

### C. The Evidence Establishes Brandon Had Sufficient Time to Commit the Murders

The defense claims Brandon had at the most twenty minutes to kill his parents. The State argues Brandon had sufficient time to commit the murders. Dennis and Norma were alive around nine o'clock when they talked on the telephone with Opal Johnston, Brandon's grandmother. Johnston testified it was not a long conversation. Brandon was placed at the Heath house by a neighbor sometime between 10:15 p.m. and 10:45 p.m.[19] Cell phone records indicate Brandon

---

[19]Randy Lunz, a neighbor at the Heath house, testified he saw Brandon at the Heath house after 10:00 on the night of

13

had passed Lake Ray Hubbard and was proceeding into Dallas by 10:45 p.m.[20] The State introduced evidence that the driving time from Royse City to the Heath house was approximately twenty-three minutes.[21]

The defense argues that Brandon would not have killed his parents until after 9:35 p.m. because he called Morgan at 9:32 p.m. This call went to Morgan's voicemail. Morgan then called Brandon at 9:41 p.m., and the call lasted three minutes. Brandon made or received twenty-five calls between 8:50 p.m. and 11:22 p.m. Although nine calls were made to Brandon's cell phone between 9:32 p.m. and 10:34 p.m., Brandon did not make any calls during this time period. The State alleges these calls went to voicemail and argues Brandon was too busy committing murder to answer his cell phone. Only one call[22] had the voicemail code, but John Minor, the defense's communication expert, testified the lack of the code does not necessarily mean

the murders. Lunz testified he heard a vehicle arrive at the Heath house just before he went to sleep. Lunz stated he had taken his dogs out right after the news came on around 10:00, gone to bed, and it takes him about fifteen to twenty minutes to get to sleep. Lunz testified, once he saw it was Brandon, he went back to bed. Lunz testified he thought Brandon had on a white T-shirt and blue jeans, but admitted Brandon could have been shirtless. Lunz testified it takes ten to fifteen minutes maximum to take his dogs out and maybe fifteen minutes maximum to get ready for bed. When asked on redirect, "is it fair to say it's definitely at least 15, 20 minutes after 10 o'clock before you actually made it to bed," Lunz responded in the affirmative. Thus, the latest time would be 10:45 p.m. and the earliest time would be 10:15 p.m.

[20]Jerry LaBerteaux, an employee of AT&T called by the State, testified the murders occurred during a period of time when AT&T and Cingular were merging. During this time, Cingular customers could use AT&T towers, but the calls would not appear on their bills. The police obtained and preserved Brandon's Cingular records, but did not request records from AT&T. Because the records are normally only retained for six to nine months, the records from AT&T could not be obtained. Therefore, complete data for Brandon's cell phone calls were only available for four of the more than twenty calls Brandon received between seven and eleven the night of the murders. The earliest of these four calls was around 10:45 p.m. and indicates that Brandon was driving into Dallas at the time.

[21]The Attorney General's Office investigator admitted the exact traffic conditions could not be replicated.

[22]This call was the one Brandon made to Morgan's cell phone.

14

the call did not go to voicemail.   Minor testified the only way to be absolutely sure the call went to voicemail is when the code is present.   Although Minor testified there is no reason to disbelieve the calls went to voicemail, he testified there is no evidence to support that the calls did go to voicemail.   None of the calls Martinez placed to Brandon's cell phone have the voicemail code. At trial, the defense argued Brandon would not have taken time out to talk to Morgan while in the middle of murdering his parents.   A rational juror could have concluded Brandon had sufficient time to murder his parents.

### D.      Allegations of Motive

#### 1.       Brandon Had Just Told His Parents He Was Gay

Brandon informed his parents he was attracted to other men on the weekend the murders occurred.   The State argues this provides a motive for their murders.   Lach testified that Dennis was disappointed due to the risk of AIDS in a homosexual lifestyle.   Lach testified Dennis was "very sad and hurt." There is no evidence, though, that Norma and Dennis, while disappointed, threatened to disown Brandon.   Todd Williams testified Brandon had always been respectful to his parents.   Grace Jackson testified Brandon always had a good relationship with his mother.[23]

#### 2.       Brandon Was Flunking Out of School

---

[23]Brandon's father did not often participate in FFA and 4-H activities.   Witnesses speculated that Dennis probably did not participate either because he was extremely overweight or because he was more of a computer-type person.

15

Brandon had been conditionally admitted to ACU on academic probation.[24]  Brandon had been dropped from several classes for failing to attend classes.  Brandon's parents had informed him they would not pay for any additional college expenses if he failed to prove himself in his first semester.  Matthews testified she presumed he would have to move back in with Dennis and Norma if he flunked out of school.  In the news interview, Brandon stated he did not sleep at the Royse City house because he did not "like that kind of atmosphere."[25]

### 3. Brandon Had Credit Card Debt

Several witnesses testified Brandon's spending habits created tension between him and his father.  Brandon had maxed out two credit cards.  Brandon and Dennis had a fight when Brandon spent a college tuition refund that belonged to Dennis.  At the time of the arrest, Brandon had his parents' debit card on him.

The defense presented contrary evidence that Brandon's finances were not out of control. Ranger Collins conceded it is not unusual for college students to run up credit card debt.  Jackson testified Brandon had been receiving payments on a horse he had sold.  Gentry testified Brandon received $15,000.00 for a horse that died and several thousand dollars for "modeling."  Further, the amounts of Brandon's credit cards, while considerable for the time he had the cards, only totaled

---

[24]Charla testified Brandon had not done well academically in high school.

[25]Deann Glover, who worked with Brandon at Chism Feed, testified Brandon was excited about the move because Dennis and Norma would have more land for his animals.

approximately $3,810.04.[26]  Further, Dennis and Norma had $300,000.00 in credit card debt. The defense argued Brandon's credit card debt may have been learned from his parents' behavior and was not much evidence of a motive.

### 4. Brandon Wanted His Mother's Truck

The State argues Brandon's desire for Norma's truck and the fact that Brandon had Norma's truck in Abilene establishes a motive for the murders. Brandon claimed to have had Norma's truck because his truck had broken down. When examined by the police, Brandon's truck did not appear to have any mechanical problems. Charla testified that Brandon had been permitted to drive the truck for prom, but not for anything else. Charla opined her mother would not have let Brandon drive the truck to Abilene. Charla testified she had driven Norma's truck on only one occasion. On cross-examination, Charla admitted she had told the Texas Rangers that Brandon had been permitted to drive Norma's truck to haul stock trailers. A number of witnesses testified Norma was very protective of her truck.

The defense, however, presented a number of witnesses who testified Brandon would drive Norma's truck on occasion. Randy Lunz, Dennis and Norma's neighbor at the Heath house, testified Brandon drove Norma's truck one time when his truck had broken down. Michelle Lee testified Brandon was allowed to drive the truck and had done so on multiple occasions for the FFA. Other than the FFA, Michelle admitted the only other occasion she had seen Brandon driving the truck was for prom. Keel and Jackson testified they had both observed Brandon

---

[26]Based on the October 2005 billing cycle.

17

driving Norma's truck during the summer before he started college. Deann Glover testified she had seen Brandon driving Norma's truck at least twice when he came in for feed. Charla testified Brandon would frequently ask to borrow the truck and would frequently pester his mother until he got his way.

### 5. Life Insurance

Although the State did not emphasize life insurance as a motive, the evidence at trial indicated Dennis and Norma had life insurance policies. Charla testified she purchased a manufactured house, "a tractor, fixed up the land, [and] a four-wheeler" with her part of the proceeds from Dennis' and Norma's life insurance. The evidence showed that Brandon's part of the life insurance proceeds were being held pending the outcome of the murder trial. Neither party has directed this Court to where in the record there is evidence concerning the amount of the life insurance policies.

### E. Defense Argument

#### 1. Investigation Deficiencies

The defense emphasizes a number of deficiencies in investigating the crime. The State failed to fingerprint many items in the Royse City house, failed to perform DNA testing of the blood stains on the carpet and bathroom sink, and failed to perform DNA testing on the hairs found in Norma's hand.[27] Many items were seized, but not logged and stored in an office. These

---

[27]Norma had hairs in her right hand. Although the police speculated the hairs may have been from her assailant, the hairs were not tested.

deficiencies, though, are not sufficient to prevent a rational juror from concluding, beyond a reasonable doubt, that Brandon committed the murders.

## 2. The Defense Suspect: Mike Etherington

The defense introduced evidence suggesting Mike Etherington may have committed the murders. Etherington attempted to bolster the State's evidence. Etherington lied to the police about whether he had personally seen inculpatory statements on Brandon's MySpace page. Michelle reported the missing gun and took the holster to the Sheriff's Department at the urging of the father of a friend of Etherington.

Etherington committed a number of suspicious acts. A number of witnesses testified Etherington and Brandon were in conflict. Gentry testified Brandon and Etherington were not getting along. Williams testified Norma suspected Etherington of poisoning Brandon's dog. After the bodies were found, Etherington made a number of calls to the Royse City house and used *67 to prevent his name from appearing on the caller ID. The bodies were discovered on the evening of October 18. The first attempt to call the Royse City house was on October 19 at 12:20 a.m. Michelle testified that Etherington had been to the Lees' house a few days prior to the murders as well. Therefore, Etherington could have stolen the gun. Etherington's phone records indicate he was approximately five miles from the Royse City house on the night of the murders. The record, though, does not establish where Etherington lives or where he was on the night of the

19

murders. There is no evidence, beyond mere surmise, that Etherington had anything to do with the murders.

### F. The Evidence Is Legally Sufficient

Portions of the State's arguments are either marginally relevant or highly probative of Brandon's guilt. The State's evidence merely suggests the missing gun may have been the murder weapon and Brandon may have stolen it. While the evidence clearly establishes the dagger belonged to Brandon and had Dennis' blood on it, the record contains conflicting evidence concerning whether the dagger was the murder weapon. We also note a number of the State's witnesses have credibility issues.

The plurality opinion in *Brooks* suggests "the 'confusing' factual-sufficiency standard may have skewed a rigorous application of the *Jackson v. Virginia* standard by the court of appeals." *Brooks*, 2010 WL 3894613, at *14 (Hervey, J., lead op.). The United States Supreme Court has made it abundantly clear that no weighing of the evidence is permitted under the *Jackson v. Virginia* standard. *See Tibbs v. Florida*, 457 U.S. 31, 47 (1982) (discussing difference between legal and factual sufficiency and holding Double Jeopardy Clause does not bar retrial when a case is reversed for factual sufficiency). The United States Supreme Court distinguished a reversal based on an "independent assessment of evidentiary weight" from the *Jackson v. Virginia* standard and stated, under *Jackson v. Virginia*, "[t]he trier of fact, not the appellate court, holds 'the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw

20

reasonable inferences from basic facts to ultimate facts." *Id*. at 45 nn.21 & 22 (quoting *Jackson*, 443 U.S. at 319). The only weighing of the evidence permitted under *Jackson v. Virginia* is when no rational juror could find a witness credible.[28] While a number of the State's witnesses have credibility issues, the credibility concerns are not so strong that a rational juror could not have found their testimony credible.

The question presented is whether the evidence is so weak that a rational juror could not have found Brandon guilty beyond a reasonable doubt. Viewed in a light most favorable to the prosecution, there is evidence from which a rational juror could conclude, beyond a reasonable doubt, that Brandon committed the murders. The State established that Brandon had the opportunity to commit the crime. Brandon had sufficient time to commit the murders and could have stolen the missing gun. A dagger with Dennis' blood on it was identified as belonging to Brandon. Brandon lied about the times of his activities and behaved suspiciously. A rational juror could have found Brandon guilty beyond a reasonable doubt. The evidence is legally sufficient.

## II. The Trial Court Did Not Err in Refusing to Dismiss the Indictment

In his third point of error, Brandon argues the trial court erred in not dismissing the indictment due to the State's recording of privileged attorney-client telephone calls. While

---

[28]In *Brooks*, the Texas Court of Criminal Appeals gave an example. A witness testifies that robber A robbed the store when the video recording of the event undisputedly showed robber B committed the offense. Even though it was the prerogative of the jury to believe the witness that A was the offender, a review of all the evidence would show the jury's finding is not a rational finding. *Brooks*, 2010 WL 3894613, at *11.

21

Brandon was in jail awaiting trial, the Hunt County District Attorney's Office instructed the Hunt County Sheriff's Office to record Brandon's telephone conversations with his attorneys and provide the district attorney's office with copies of the recordings. Curtis Neel, the chief jailer for the Hunt County Sheriff's Department, testified that it is the jail's practice to record all inmate telephone calls and that he provided copies of Brandon's telephone calls to the Hunt County District Attorney's Office at its request.

When the defense filed a motion to dismiss due to the recordings, the Hunt County District Attorney's Office initially resisted recusal. Judge Richard Beacom, judge of the 354th Judicial District Court,[29] ruled the Hunt County District Attorney's Office violated the Sixth Amendment right to counsel and ordered any evidence obtained as a result of the recordings be suppressed. The trial court, though, concluded the indictment should not be dismissed and the Hunt County District Attorney's Office was not disqualified.

The State does not challenge the trial court's conclusion that Brandon's Sixth Amendment right to counsel was violated. A defendant has a right to reasonably effective assistance of counsel at all critical stages of the criminal proceedings under the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment. U.S. CONST. amend. VI, XIV; *Gideon v. Wainwright*, 372 U.S. 335 (1963); *see Strickland v. Washington*, 466 U.S. 668, 686–92 (1984).

---

[29]Unless specified otherwise, this memorandum will refer to The Honorable Richard A. Beacom as the trial court.

While not absolute,[30] a criminal defendant has the right to communicate and consult in private with his or her attorney. The Third Circuit Court of Appeals has described the Sixth Amendment right to counsel as follows:

> The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government.

*United States v. Levy*, 577 F.2d 200, 209 (3d Cir. 1978). "If a state agent interferes with confidential attorney-client communications, not only is there a risk of disclosure of confidential information but also such an intrusion chills free discussion between a defendant and his attorney." *State v. Pecard*, 998 P.2d 453, 459 (Ariz. Ct. App. 1999). It is beyond dispute that the actions of the Hunt County District Attorney's Office constituted a violation of the Sixth Amendment right to counsel. However, the existence of an infringement on this right does not always justify the extreme remedy of dismissal.

---

[30]We are not suggesting that any restriction of the right to communicate with counsel or any monitoring of telephone calls constitutes a constitutional violation. "Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983); *see Cacicio v. Secretary of Pub. Safety*, 665 N.E.2d 85, 92 (Mass. 1996) (monitoring of other telephone calls did not violate the Sixth Amendment when attorney-client telephone calls were not monitored); *State v. Hancock*, 840 N.E.2d 1032, 1051 (Ohio 2006) (inability to visit client "on the spur of the moment" not constitutional violation).

Both the United States Supreme Court and the Texas Court of Criminal Appeals have noted that dismissal may be the appropriate remedy for certain violations of the Sixth Amendment right to counsel. *United States v. Morrison*, 449 U.S. 361, 365-66 (1981); *State v. Frye*, 897 S.W.2d 324, 330 (Tex. Crim. App. 1995). However, both courts have also cautioned that dismissal is appropriate only when the suppression of evidence is insufficient to purge the taint of the violation. The United States Supreme Court has stated, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate."[31] *Morrison*, 449 U.S. at 365. The Texas Court of Criminal Appeals has held:

> When confronted with a Sixth Amendment violation, a trial court must, "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant effective assistance of counsel and a fair trial." *Morrison*, 449 U.S. at 365 . . . . The Supreme Court stated that suppressing evidence and limiting cross-examination are the preferred methods for neutralizing the effects of right to counsel violations.

*Frye*, 897 S.W.2d at 330 (quoting *Morrison*, 449 U.S. at 365). Dismissal of an indictment is "a drastic measure only to be used in the most extraordinary circumstances." *Id.*; *see State v. Mungia*, 119 S.W.3d 814, 817 (Tex. Crim. App. 2003) (trial court erred in dismissing indictment without constitutional violation).

---

[31]In a footnote, the United States Supreme Court suggested an exception to this rule may exist when there is a pattern of recurring violations. *Morrison*, 449 U.S. at 365 n.2. The Court stated "the record before us does not reveal a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness." *Id*. This case does not demonstrate a pattern of recurring violations.

In our review of the record, we have reviewed the telephone calls recorded by the Hunt County Sheriff's Office at the request of the Hunt County District Attorney's Office. [32] Approximately 165 telephone calls were recorded, including both privileged and nonprivileged calls. Approximately fifty-four of the calls were made to Brandon's defense counsel or his office staff. The following is a summary of the recorded privileged telephone calls. Most of the calls discuss irrelevant information such as relatives providing Brandon with money, clothes Brandon is going to wear for court appearances, other inmates, and lockdowns. A number of calls contain discussions about where witnesses live and attempts to track down the telephone numbers of witnesses. On Exhibit 1B, the defense counsel's secretary and Brandon discuss how Etherington lied in his statement to the police. On Exhibit 1E, track 5, the defense counsel's secretary and Brandon mention they can prove why he did not have shoes on the night of the murder without providing any details. On Exhibit 1L, track 6, Brandon and the attorney's secretary discuss that one of the profilers used to date his sister. On Exhibit 1M, track 5, they talk about Mike Lee. On Exhibit 1P, track 1, the attorney's secretary asks Brandon what truck he drove to the Heath house and Brandon informs her he drove his truck to the Heath house and then drove Norma's truck to Abilene. Our review failed to discover any privileged information of even the most marginal value to the State. Although not for lack of trying, the Hunt County District Attorney's Office failed to discover anything of value when it violated Brandon's constitutional rights.

---

[32]Although the record suggests the telephone calls were transcribed, no transcriptions of the calls have been provided to this Court on appeal. On appeal, the record contains thirty-four CDs, each containing multiple recorded telephone calls.

The Texas Court of Criminal Appeals has held that it is the defendant's burden to show prejudice or a substantial threat thereof. *Murphy v. State*, 112 S.W.3d 592, 603 (Tex. Crim. App. 2003) (noting split among federal courts concerning whether there is rebuttable presumption of prejudice). Brandon has failed to provide this Court with any demonstrable prejudice. Brandon argues a substantial threat of prejudice has been demonstrated because the State gained insights into the defense's thought processes. Prejudice can be demonstrated either when the State obtains information which leads to admissible evidence against the accused or obtains any information that would only give the State a tactical advantage. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977); *Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977); *Graddick v. State*, 408 So.2d 533, 546 (Ala. Crim. App. 1981) ("The dangers of subtle use by the prosecutor of the information from the conversation either evidentially or strategically, are obvious.").

In this case, it is clear that some information was elicited. The State's attorney who reviewed the tapes took forty-three pages of notes.[33] Ranger Collins admitted that he reviewed eight or ten telephone calls and that at least one of them would have been covered by the attorney-client privilege. Collins admitted he conducted "[s]ignificant investigations" in this case and was still working on the case when he reviewed the telephone calls. Collins, though, testified

---

[33]However, the existence of forty-three pages of notes does not imply the notes contain any useful information.

his notes "were of no value to me." The record, though, does not contain evidence that the prosecutor or the police obtained any useful information.[34]

It was apparent that the defense attorneys suspected that the telephone calls were being recorded. The defense attorney's office frequently reminded Brandon the telephone calls might be recorded and on a few occasions declined to discuss certain topics with Brandon over the telephone. In fact, on Exhibit 1F, track 5, the defense attorney informs Brandon that the district attorney's office has recorded attorney-client telephone calls in another case. On Exhibit 1L, track 5, the defense counsel's secretary mentions that she has been listening to the recordings. Certain matters were referred to by references so vague that the references could not be deciphered.

Although the recording of the telephone calls might have chilled effective communication over the telephone, the record does not indicate Brandon could not effectively communicate with his counsel through other means. The recorded conversations do not reveal anything that would be useful to the State. While there may be a theoretical threat of prejudice, there is not a substantial threat of prejudice. Because Brandon has failed to show demonstrable prejudice or a substantial threat thereof, the trial court did not err in refusing to dismiss the case. *See Arroyo v. State*, 259 S.W.3d 831, 834 (Tex. App.–Tyler 2008, pet. ref'd) (dismissal not required where no information was elicited from defendant).

---

[34]At a later hearing, the defense presented evidence before Webb Biard, Senior Judge of the 6th Judicial District Court, that the tapes had been played to at least two fact witnesses. Both witnesses testified the tapes did not have any influence on their testimony. This evidence, though, was not before Judge Beacom when he denied the defense's motion to dismiss.

**III.     The Trial Court Did Not Err in Denying Examination of Assistant District Attorney**

In his fourth point of error, Brandon argues the trial court erred in limiting his questioning of the assistant district attorney who reviewed the recordings.   After the trial court's ruling on Brandon's motion to dismiss, the Hunt County District Attorney's Office recused itself.   The Texas Attorney General's Office agreed to prosecute the case.   The trial court issued an order appointing an Assistant Texas Attorney General as special prosecutor and, in that order, instructed the Texas Attorney General's Office to "have no contact with the Hunt County District Attorney concerning this case until further order of the Court."   The trial court requested a visiting judge be appointed to "ensure any suppressed evidence is not transmitted from the District Attorney to the Attorney General."[35]

Judge Webb Biard was appointed by the administrative judge for the First Administrative Judicial Region.   The defense filed a motion to require the Hunt County District Attorney's Office to disclose any information learned as a result of the recordings.   During the hearing on the motion, Judge Biard denied the defense's request to question the assistant district attorney who reviewed the recordings.   After a review of the transcripts of the telephone calls and an in camera review of the Hunt County District Attorney's Office's file, Judge Biard concluded the Hunt County

---

[35]After finding the Sixth Amendment violation, the trial court properly followed the United States Supreme Court directive to "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant effective assistance of counsel and a fair trial."   *Morrison*, 449 U.S. at 365.

District Attorney's Office did not obtain any useful information from the recordings and denied the defense motion.[36]

The origin of the attorney work-product privilege is more amorphous in criminal cases than in civil cases. In civil cases, it is provided for specifically in the Texas Rules of Civil Procedure. The Texas Rules of Evidence, which apply to both civil and criminal cases explicitly provide for the attorney-client privilege, but are not as explicit concerning the attorney work-product privilege. Rule 503(b) provides as follows, in pertinent part:

> **(b)** **Rules of Privilege.**
> (1) *General rule of privilege.* A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client:
>     (A) between the client or a representative of the client and the client's lawyer or a representative of the lawyer;
>     (B) between the lawyer and the lawyer's representative;
>     (C) by the client or a representative of the client, or the client's lawyer or a representative of the lawyer, to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein;
>     (D) between representatives of the client or between the client and a representative of the client; or
>     (E) among lawyers and their representatives representing the same client.
> (2) *Special rule of privilege in criminal cases.* In criminal cases, a client has a privilege to prevent the lawyer or lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship.
> **(c)** **Who May Claim the Privilege.** The privilege may be claimed by the client, the client's guardian or conservator, the personal representative of a

---

[36]The defense does not challenge the denial of this motion. The defense limits its challenge to the denial of the opportunity to question the assistant district attorney.

29

deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client.

**(d)** **Exceptions.** There is no privilege under this rule:

(1) *Furtherance of crime or fraud*. If the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud; . . . .

TEX. R. EVID. 503. The Texas Court of Criminal Appeals has adopted a nonliteral interpretation of Rule 503(b)(2) and concluded the "attorney's work-product falls under this special rule of privilege." *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *see State ex rel. Curry v. Walker*, 873 S.W.2d 379, 381 (Tex. 1994) (noting work-product privilege applies in criminal cases).

The defense claims the trial court erred because the crime-fraud exception applies in this case and because only core work product is protected. The State claims the crime-fraud protection does not apply to the attorney work-product privilege and claims the defense failed to show a substantial need. We will examine each argument in turn.

## A.    The Crime-Fraud Exception Does Not Apply in this Matter

The State argues the crime-fraud exception does not apply because it only applies to the attorney-client privilege.    The Texas Court of Criminal Appeals has held Rule 503(b)(2) includes the work-product privilege[37] and, therefore, we hold the exceptions of subsection (d) also apply to the work-product privilege in the proper circumstances.

Brandon argues the crime-fraud exception applies because the district attorney conspired to deprive him of his civil rights, citing 42 U.S.C. § 1983.    This section, however, only provides a civil cause of action.    Brandon does not argue any of the provisions of the United States Code or other statutes providing criminal liability for civil rights violations.    *See, e.g.*, 42 U.S.C.A. § 1985; 18 U.S.C.A. §§ 241, 242, 245 (West, Westlaw current through 2010).    The crime-fraud exception requires the attorney's services to be sought or obtained "to enable or aid commission of the crime." *Henderson v. State*, 962 S.W.2d 544, 552 (Tex. Crim. App. 1997) (holding mere furtherance not enough).    Brandon has failed to show the crime-fraud exception applies to the facts of this case because he has failed to show the attorney's services were sought or obtained to enable or aid in the commission of a crime.

---

[37] *Cameron*, 241 S.W.3d at 19.

**B.     The Distinction Between Core Work Product and Other Work Product Exists in Criminal Cases**

The State argues the defense was seeking core work product, which is not discoverable.

In civil cases, a distinction is made between core work product and other work product.   In *Pope v. State*, the Texas Court of Criminal Appeals made the following statements:

> The scope of the attorney work-product doctrine is sometimes confused with that of the attorney-client privilege.  The attorney-client privilege is an evidentiary privilege and protects against the compelled disclosure of confidential communications.  This privilege belongs to and protects the client.  The attorney work-product doctrine, while not a true evidentiary privilege, belongs to and protects the attorney.  Its purpose is to stimulate the production of information for trials, and it rewards an attorney's creative efforts by giving his work product a qualified privilege from being shared with others.  It is premised on the notion that an attorney should not be compelled to disclose the fruits of his labor to his adversary.  Under Texas civil rules, material that reflects the attorney's personal thought processes is "core work product" and receives absolute protection, while other materials, such as documents, reports, or memoranda compiled by the attorney or his agents and communications made in anticipation of litigation or trial are "other work product" and receive qualified protection.  While the work-product doctrine protects the communications of parties, attorneys, and agents, the underlying factual information is not protected.  For example, descriptions of potential witnesses and statements that would reveal whether the party had spoken to potential witnesses are not work product and are discoverable. As Professor Dix has explained:
>> if defense counsel's efforts do not create or enhance the substantive information, that information -- or the form in which it is preserved -- does not become protected work product.
> That is, facts that are divulged by or exist independent of the attorney or his agents are not protected, but statements or documents that set out their thoughts concerning the significance of these facts or the strategic conclusions that the attorney or his agents draw from them may well be protected.  Thus, material prepared by a consulting expert appointed by the trial court to assist the defense in developing strategies and theories is protected by the work-product doctrine when

32

> that material reflects the expert's thoughts regarding the strength and weaknesses of a defense theory.

207 S.W.3d 352, 357–58 (Tex. Crim. App. 2006) (footnotes & citations omitted). We conclude the distinction between core work product and other work product applies in criminal cases. However, the scope of the defense's request was not limited solely to core work product. "[T]he work-product privilege does not operate as a blanket privilege covering all decisions made by the DA's Office." *In re Crudup*, 179 S.W.3d 47, 50 (Tex. App.–San Antonio 2005, orig. proceeding), *mand. granted on other grounds sub nom.*, *In re Bexar County Crim. Dist. Attorney's Office*, 224 S.W.3d 182, 188 (Tex. 2007). Any facts divulged to the assistant district attorney would be other work product and would be discoverable upon a showing of substantial need and the inability to obtain its substantial equivalent by other means without undue hardship.

## C. The Defense Failed to Establish a Substantial Need

The State argues, even if the other work product is not protected, that the defense failed to demonstrate a substantial need to question the assistant district attorney. The Texas Supreme Court has held a party must show "substantial need" for the testimony and the inability to obtain its substantial equivalent by other means without "undue hardship." *Bexar County Crim. Dist. Attorney's Office*, 224 S.W.3d at 188. We believe that requirement is a reasonable one and should apply to criminal cases as well as civil.

The defense failed to establish a substantial need. While substantial need may have been demonstrated if the recordings contained useful information,[38] the recordings did not contain any useful information. As such, there was no substantial need to question the assistant district attorney. We overrule Brandon's fourth point of error.

## IV. The Trial Court Did Not Err in Admitting the Interrogation

Prior to Brandon's arrest, Brandon and other family members were interrogated by Hunt County sheriff's deputies and Ranger Collins. These interrogations occurred approximately six days after Brandon's parents were found dead. At Brandon's interrogation, two attorneys were present at the request of Brandon's aunt.[39] At least one attorney was present during the entire

---

[38]Under this hypothetical, the defense might have a substantial need to question the prosecutor to establish prejudice.

[39]Linda Matthews, Brandon's aunt, testified at trial the investigators had informed her that family members could not be present during the interview. Matthews testified she "didn't want [Brandon and his sister] in there by themselves" because "[t]hey had just lost their parents. They were young." Matthews, who was a legal assistant in Texarkana, asked her boss for help finding an attorney. Her boss, who was a civil attorney, but had done criminal work earlier in his career, and her boss' son, who was an attorney with more recent criminal experience, were present during the

34

interview. Brandon argues the circumstances of the interview establish that it was a custodial interview and that his statements were involuntary because the attorneys told him he would be arrested if he did not answer the investigators' questions.

Terry Jones, a Hunt County investigator, testified Brandon arrived with his family in their own vehicles. Although Jones admitted Brandon was suspected of committing the murders, Jones testified Brandon was not given *Miranda*[40] warnings. The interrogation began by Brandon complaining about the investigators tearing up his dormitory room and about the way they were conducting the investigation. Early in the interrogation, an unidentified speaker—presumably one of the attorneys—stated:

> UNIDENTIFIED SPEAKER: And maybe I better say what I said to your sister a while ago, that we've been -- we've been asked to come here as your temporary attorneys, and as such, we are bound by our -- by the law and our professional ethics. We can't repeat anything that's said in here.
>
> A. [Brandon] Okay. And I --
>
> UNIDENTIFIED SPEAKER: Now, they -- they're investigators. They can repeat it. But -- so if there's any question that you don't want to answer, of course, you have a right to remain silent. But on the other hand, they have a right to have you arrested and put you -- you know, charge you and this or --
>
> Q. [Ranger Collins] But you understand this -- you are not in custody.
>
> A. [Brandon] Okay.
>
> Q. [Ranger Collins] This is not a custodial interrogation.

---

interview. The record does not contain any more detailed information concerning these attorneys.

[40]*Miranda v. Arizona*, 384 U.S. 436 (1966).

35

. . . .

> UNIDENTIFIED SPEAKER:  . . . we'll have to tell you, you have a right not to answer.  On the other hand, there are consequences of not answering, and we can't -- we can't guarantee that -- that something won't happen.  And of course, their folks [sic], as to all officers, is to investigate this matter --
>
> A.    [Brandon]   Right.
>
> UNIDENTIFIED SPEAKER: -- and --
>
> A.    [Brandon]   Exactly.
>
> UNIDENTIFIED SPEAKER: -- in an attempt to determine who perpetrated this crime -- these crimes.   And the only way we can -- we can proceed with you is you can answer what you want to answer, but it's not as though that's the end of the story.

At multiple times during the interview, the attorney also advised Brandon not to argue with the police officers.

Most of the interrogation involved background information on Brandon, his parents, and their friends.   The interrogators, however, did ask Brandon about his whereabouts on the evening of his parents' murders.   Near the end of the interview, Brandon provided a saliva sample for DNA testing.   When Collins told Brandon that his version of events did not comport with other evidence and accused Brandon of being involved in the murders, Brandon denied his involvement and expressed his aggravation that the police were "trying to look for an easy way out of this." Collins responded,

36

> Well, let me ask you this, because we've been called by a teacher from Rockwall, or told from a teacher in Rockwall that after this happened, that the kids there in the class said, well, dang, if they're dead, Brandon did that. Everybody knows he hates his parents' guts.

After this interchange, one of the attorneys asked Brandon if he was ready to leave. When Brandon asked if he could leave, Collins responded, "[Y]ou've been free to go the whole time," and Brandon left the interrogation room. Brandon was arrested the following morning.

We apply a bifurcated standard of review to a trial court's denial of a motion to suppress, giving great deference to the trial court's determination of historical facts and reviewing de novo the trial court's application of the law. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). We give almost total deference to the trial court's determination of historical facts, especially when the trial court's fact findings are based on an evaluation of the credibility and demeanor of a witness. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1977). Mixed questions of law and fact that do not turn on the credibility and demeanor of a witness are reviewed de novo. *Ross*, 32 S.W.3d at 856. This issue requires the court to make two inquiries: whether *Miranda* applies and whether the statements were voluntary.

### A. *Miranda* and Article 38.22 Do Not Apply Because the Statement Was Not the Result of a Custodial Interrogation

Brandon argues the statement should have been suppressed because he was not given the warnings required by *Miranda*, and Article 38.22, Section 5 of the Texas Code of Criminal

Procedure. Article 38.22 of the Texas Code of Criminal Procedure and *Miranda* apply only to statements made as the result of custodial interrogation. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005); *Miranda*, 384 U.S. 436. Whether an interrogation is custodial depends on whether, under the circumstances, a reasonable person would believe his or her freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996); *Rodgers v. State*, 111 S.W.3d 236, 239-41 (Tex. App.-Texarkana 2003, no pet.). In determining whether an interrogation is custodial, we look to the objective circumstances, not to the subjective views harbored by either the interrogating officer or the person being questioned. *See Stansbury v. California*, 511 U.S. 318, 323 (1994). The subjective views of the interrogating officer and the person being questioned are irrelevant unless they are manifested in the words or actions of law enforcement officials. *See Dowthitt*, 931 S.W.2d at 254.

Brandon argues a reasonable person in Brandon's place would not have felt he was free to leave. The State directs our attention to the fact that Brandon was informed multiple times that he was not in custody and that Brandon terminated the interview. After reviewing these facts, we find that the circumstances of this interrogation would not cause a reasonable person to conclude he or she was restrained to the degree associated with a formal arrest. Brandon was not restrained in any way, and the officers denied Brandon was in custody. While the officers may have had probable cause to arrest Brandon, there is no indication Brandon was informed that the officers had

38

probable cause to arrest him. The interrogation was not custodial and, therefore, *Miranda* and Article 38.22 do not apply.

### B. No Abuse of Discretion in Concluding the Statement Was Voluntary

Even though *Miranda* does not apply, that does not end our inquiry. Due process, under the Fourteenth Amendment, is violated if an involuntary statement is used to establish guilt. *See Brown v. Mississippi*, 297 U.S. 278 (1936); *Carter v. State*, 309 S.W.3d 31, 41 (Tex. Crim. App. 2010). Under the Fourteenth Amendment, a statement is involuntary only if it is the result of official misconduct and the defendant's will was overborne. "[T]he factfinder must examine all of the circumstances and the course of police conduct in evaluating the voluntariness of those post-*Miranda* statements." *Carter*, 309 S.W.3d at 41. Appellate courts "must give great deference 'to the trial judge's decision to admit or exclude such evidence, which will be overturned on appeal only where a flagrant abuse of discretion is shown." *Id*. at 42 (quoting *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007)).

#### 1. There Was No Official Misconduct

Under the Fourteenth Amendment, the first step in our analysis is whether there was official misconduct or coercion. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986). In this case, there is no evidence of misconduct by any governmental officials. Brandon argues, however, that the governmental officials sanctioned the coercive misconduct of private parties. According to

39

Brandon, the statements by his private attorneys that he would be arrested if he did not provide a statement were sanctioned by the interrogators.

*Connelly* concerned a defendant who heard hallucinatory voices which demanded that he confess or kill himself. *Id.* at 161. The United States Supreme Court noted that the mental condition of the defendant is a factor in the "voluntariness" calculus," but cautioned "this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness." *Id.* at 164. In distinguishing *Blackburn v. Alabama*, 361 U.S. 199 (1960) (defendant insane and police knew of mental problems), and *Townsend v. Sain*, 372 U.S. 293 (1963) (defendant had been given drugs with truth-serum properties and police knew he had been given drugs), the United States Supreme Court explained that the police in those cases were aware of the condition and exploited that condition.

There is no evidence that the attorneys were acting in concert with the investigating officers to obtain a statement. In this case, there is no evidence that the officers knew Brandon interpreted the attorneys' statements to mean he would be arrested if he did not give a statement. The attorneys did not specifically state Brandon would be arrested if he failed to give a statement. Such an interpretation must be inferred from the statements. Although the statements might be misinterpreted, there is no evidence the officers were aware of this misinterpretation and exploited

or sanctioned it. The trial court did not abuse its discretion in rejecting the argument that the law enforcement officers sanctioned the statements.

### 2. Brandon's Will Was Not Overborne

Even if there was official misconduct, Brandon has failed to show his statement was not voluntary. Once official misconduct has occurred, the next question under the Fourteenth Amendment is whether the defendant's confession or admissions were voluntary. A statement is involuntary if the totality of the circumstances surrounding its acquisition shows that the defendant's will was "overborne" by police coercion. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997). "A statement is 'involuntary,' for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); *Reed v. State*, 59 S.W.3d 278, 281 (Tex. App.—Fort Worth 2001, pet. ref'd). A defendant's age is a relevant factor in the voluntariness analysis. *Diaz v. State*, 61 S.W.3d 525, 529 (Tex. App.—San Antonio 2001, no pet.) (considering fifteen-year-old defendant's age in concluding statement was involuntary).

The ultimate question is whether the suspect's will was overborne. *Id.*; *Lugo v. State*, 299 S.W.3d 445, 451 (Tex. App.—Fort Worth 2009, pet. ref'd). Brandon was a nineteen-year-old college student and did not appear to be unduly intimidated during the interview. In fact, Brandon argued with the investigators on a number of occasions. It is clear that Brandon's will was not

41

overborne.  Brandon made no confession or incriminating statements during the interview, but merely denied everything.  The trial court did not abuse its discretion in concluding that the statements were voluntary.

## V.      Conclusion

The evidence was sufficient under *Jackson v. Virginia*.  The trial court did not err in denying the motion to dismiss because the State failed to obtain any useful information by recording and reviewing Brandon's privileged attorney-client telephone calls.  The remedy ultimately fashioned by the trial court—ordering all evidence obtained as a result of the recording suppressed—was sufficient to identify and purge the taint.  The effectiveness of this remedy was further enhanced when the Hunt County District Attorney's Office recused from the case and the file was reviewed before being transferred to the Texas Attorney General's Office.  Judge Biard did not err in refusing to permit questioning of the assistant district attorney who reviewed the recordings because the defense failed to establish substantial need.  Finally, the trial court did not err in denying the motion to suppress.

For the reasons stated, we affirm.


Jack Carter
Justice

Date Submitted:        October 6, 2010
Date Decided:          December 3, 2010

Publish