

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00197-CR
No. 02-22-00198-CR

———————————————

ROYCE EDWARD WOOD, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 271st District Court
Wise County, Texas
Trial Court Nos. CR23370, CR24196

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

## I. Introduction

Dashboard- and body-camera video and other evidence showed that on June 13, 2021, City of Rhome Police Officers Rex Richie and Brody Brown were pursuing Appellant Royce Edward Wood, who fired a gun at them.[1] One of Wood's bullets hit Officer Richie in the left foot.[2] Wood pleaded guilty in each case to aggravated assault on a peace officer, *see* Tex. Penal Code Ann. § 22.02(a), (b)(2)(B), enhanced by prior convictions to which Wood pleaded true,[3] and he asked a jury to assess his punishment. Wood's prior convictions increased the potential range of confinement

---

[1]In trial court cause number CR23370 (appellate cause number 02-22-00197-CR), Wood was charged with having intentionally or knowingly threatened Officer Brown with imminent bodily injury by shooting in his direction with a deadly weapon (firearm) when he knew Officer Brown was a police officer lawfully discharging an official duty (attempting to apprehend Wood who was fleeing the scene of a traffic stop).

[2]In trial court cause number CR24196 (appellate cause number 02-22-00198-CR), Wood was charged with knowingly or recklessly causing bodily injury to Officer Richie by shooting him with a deadly weapon (firearm) when he knew Officer Richie was a police officer lawfully discharging an official duty (attempting to frisk Wood). It further charged, as an alternative manner and means, that Wood had knowingly threatened Officer Richie with imminent bodily injury by shooting in his direction.

Officer Richie testified that the gunshot wound caused him "[i]mmense pain," but although the bullet fractured three foot bones, the injury did not require surgery, his nerves and arteries were undamaged, and his injuries were not life-threatening. Although physical therapy returned his foot's functionality, he was placed on light duty for five months and returned to full duty in November 2021.

[3]Both indictments listed three enhancement paragraphs setting out Wood's two 2013 burglary-of-a-habitation convictions and his 2013 robbery conviction.

to 15–99 years or life. *See id.* § 12.42(c)(1). The jury assessed Wood's punishment at 60 years' confinement and a $10,000 fine in Officer Brown's case and confinement for life and a $10,000 fine in Officer Richie's case. The trial court entered judgment accordingly and set the sentences to run concurrently.

In five issues, Wood complains that the trial court erred by (1) not recusing the Wise County District Attorney (DA)'s Office after the county recorded and reviewed his privileged jail calls; (2) denying his request for mistrial after Officer Brown's nonresponsive testimony; (3) not allowing him to cross-examine Officer Richie about prior officer misconduct; (4) not allowing him to present mitigating evidence of pretrial solitary confinement in violation of "Texas Jail Standards"; and (5) not declaring a mistrial or questioning jurors after the State's witnesses conversed outside the jury room's open door during a break. Because none of Wood's complaints present reversible error, we affirm.

## II. Discussion

We begin with Wood's recusal complaint, followed by his mistrial, cross-examination, and mitigating-evidence complaints.

### A. Recusal

In his first issue, Wood complains that the trial court erred by not recusing the DA's office after the county recorded and reviewed his attorney–client privileged phone calls. The State contends that Wood did not prove a violation of his Sixth Amendment right to counsel because he failed to show the State's deliberate

elicitation or purposeful intrusion into the attorney-client relationship or that any prejudice was caused thereby.

During Wood's pretrial incarceration, the county jail recorded his phone calls, including calls with his attorney, and forwarded the recordings to the DA's office. At the August 3, 2022 pretrial hearing, Wood's counsel informed the trial court that the recordings had come to her attention when she saw her law partner's name on the State's witness list. In her recusal motion, Wood's counsel stated,

> Since Mr. Wood has been in custody, the jail has routinely recorded all of his telephone calls and electronic correspondence **at the request of the District Attorney's Office**. On June 27, 2022, Defense Counsel received discovery from the Wise County District Attorney's Office containing recordings of Mr. Wood's communications. *At least* twenty of these recorded calls were made by Mr. Wood [to his counsel's law firm.] *At least* six of these recordings contain substantive, privileged discussions between Mr. Wood [and his counsel].

At the subsequent hearing, defense counsel provided the trial court with audio files of the recordings and their transcription, and Jack McGuinn, one of the DA's two investigators, testified that when he came across two phone calls to an attorney's office, as soon as the person answering the calls identified as the attorney's office, he stopped listening and immediately deleted those calls. He did not, however, look through the call log to redact or delete all calls to the law firm's number, although he admitted that he "probably should have." Although he had intended to brief the attorneys in his office about the situation, he had not had the opportunity to do so, and he did not notify defense counsel's office about it or ask the jail to stop recording

attorney-client phone calls. He stated that since the issue had arisen, he had learned that attorneys could be placed on the jail's do-not-record list.

The DA's office opposed the recusal motion, arguing that the State had not accessed or listened to the phone calls and had not violated Wood's rights. The county's information technology director informed the trial court that he had deleted the records from the DA's computers and from the jail sergeant's hard drive and that the third-party software vendor could delete the phone records from its system with a court order.

The trial court reviewed defense counsel's materials—the recordings and transcripts—which were sealed and included in the record, ordered deleted all recorded phone calls from Wood at the Wise County Jail to his counsel's phone number, and denied the rest of the motion. Wood and the State then reached the plea bargain under which Wood agreed to plead guilty to the indictments and true to the enhancement paragraphs in exchange for dismissal of all the remaining indictments against him.[4]

---

[4]When Wood moved to recuse the DA, he had eight felony offenses pending—three charges of aggravated assault against a public servant and one charge each of assault against a public servant, aggravated robbery, manufacture or delivery of a Penalty Group 1 controlled substance, possession of a Penalty Group 1 controlled substance, and obstruction or retaliation.

Wood's plea bargain required him to make an open guilty plea to the first-degree-felony enhanced offenses of aggravated assault against a public servant and a plea of true to the enhancement paragraphs and deadly-weapon allegations in exchange for no prosecution for unlawful possession of a firearm by a felon, no

The six "substantive" calls contained information about why—according to Wood—he was incarcerated (he claimed "they" were picking on his girlfriend, whose trailer had been stolen); that Wood had heard that an officer in his case had a bullet wound and was the DA's friend; that the woman who had been with him at the traffic stop was innocent; that he had originally arranged with a defense attorney (Paul Belew) to turn himself in before his arrest and "not shoot it out with the cops"; that a jailer had assaulted him and if he had assaulted someone in jail, "they would leave in an ambulance and he wouldn't quit"; that he had received the assaulting-a-peace-officer indictments; and that he did not threaten a jailer in his obstruction case. Beyond the evidence—which was provided in the form of dashboard-camera and body-camera video, as well as the officers' testimonies—that Wood had shot one of the arresting officers, none of this information was offered at trial, although evidence to the contrary—such as testimony that Wood had threatened a jailer and a video of his physical altercation with jailers—was admitted into evidence.[5]

federal referral, and the State's dismissal of cause numbers CR24145, CR23481, CR23485, CR23394, CR23780, and CR24003 after the jury's sentences in the instant cause numbers. As part of the plea agreement, the trial court gave Wood permission to appeal the "recorded jail call issue" and his punishment.

[5]The prosecutor informed the trial court that the State did not intend to call Belew as a witness, and after speaking with Belew, the trial court informed the parties that Belew would not "participate in any way in this case." The Texas Ranger who investigated the case testified that Wood peacefully turned himself in at a hotel in Arkansas.

Further, each recording began with a warning that the call could be monitored or recorded, and Wood acknowledged multiple times in his initial call and in later calls that they were in fact being recorded, and his counsel's office warned him not to say anything. Most of Wood's complaints were that he was being held in solitary confinement, that he had been denied access to recreation and church with other inmates, that he wanted to await trial in a rehab center "so [he] could show positive change," and that he had been indicted on new assault-on-a-peace-officer charges for which his attorney had told him that he would not be indicted.

The State's intrusion into the attorney–client relationship violates a defendant's constitutional right to counsel when the violation prejudices the defendant. *Murphy v. State*, 112 S.W.3d 592, 602 (Tex. Crim. App. 2003) (noting that the evidence showed no prejudice to the appellant when the prosecutor who reviewed privileged documents testified that he did not use any of the materials in preparing the case); *see* U.S. Const. amends. VI, XIV; *see also United States v. Morrison*, 449 U.S. 361, 365, 101 S. Ct. 665, 668 (1981) ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."). A defendant is prejudiced by the State's intrusion into the attorney–client relationship if the State's intrusion "produced, directly or indirectly, any of the evidence at trial." *Morrison v. State*, 575 S.W.3d 1, 18 (Tex. App.—Texarkana 2019, no pet.) (quoting *Weatherford v. Bursey*, 429 U.S. 545, 552, 97 S. Ct. 837, 842 (1977)). "It is conceivable that the State might purposefully intrude into the

defendant's attorney–client relationship, but the intrusion would not prejudice the defendant because nothing of value was gained." *Id.* Or because nothing was obtained that the State did not already know. *Id.*

Wood refers us to *Woodruff v. State* to support his argument that the trial court erred. 330 S.W.3d 709, 724 (Tex. App.—Texarkana 2010, pet. ref'd) (noting that, while not absolute, a criminal defendant has the right to communicate and consult in private with his or her attorney). In *Woodruff*, the defendant was arrested for murder and, while he was in jail awaiting trial, the DA's office instructed the sheriff's office to record his conversations with his attorneys and to supply the DA's office with copies of the recordings. *Id.* at 713. The DA's office subsequently recused, the trial court ordered suppression of any evidence obtained as a result of the recordings, and the attorney general's office agreed to prosecute the case; the defendant argued that his indictment should have been dismissed. *Id.* at 713, 723. The court reviewed the 165 recorded calls, most of which discussed irrelevant information; none of the calls disclosed privileged information "of even the most marginal value to the State." *Id.* at 725. The court concluded that the defendant had failed to show demonstrable prejudice, or a substantial threat of it, and that the trial court did not err by refusing to dismiss the case. *Id.* at 726.

Here, unlike in *Woodruff*, the record does not show that the prosecutor requested that recordings of Wood's conversations with counsel be made. Further, the trial court determined the investigator's credibility and could have concluded that

the State learned nothing from the recordings, and our review of the recordings shows that they produced nothing of value to the prosecution or of which the State could not have already been aware, such as Officer Richie's gunshot wound and Wood's video-recorded behavior in jail. Accordingly, because the record does not demonstrate any prejudice to Wood, *see Murphy*, 112 S.W.3d at 602, we overrule his first issue.

## B. Mistrial

Wood raises mistrial complaints in his second and fifth issues. A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004). We review the denial of a motion for mistrial for an abuse of discretion. *Id.*

### 1. Brown's nonresponsive reply

In his second issue, Wood complains that the trial court abused its discretion by denying his motion for mistrial after Officer Brown's nonresponsive testimony. Specifically, he complains that Officer Brown "opined before the jury that it was necessary to shoot [Wood] in the back in order to prevent him from killing citizens in a nearby church." The State responds that the trial court did not abuse its discretion because the trial court's instruction to disregard cured any prejudice.

For context, we summarize Officer Brown's preceding testimony. Officer Brown testified that he and Officer Richie had been dispatched to the same area the day before the shooting for an incident involving Wood. Wood, who had allegedly

9

been in possession of a firearm, left the scene before they arrived. After meeting with county deputies about the incident, Officer Brown looked Wood up on Facebook so that he could identify him.

The next day, he and Officer Richie were dispatched to the same area, and they waited at the stop-sign intersection of two farm-to-market roads near a little church to see if Wood would drive past. After Wood ran the stop sign, they followed him. Wood stopped his motorcycle just east of a residential subdivision before they turned on their patrol car's lights to stop him. Wood's female companion stayed on the motorcycle.

Officer Brown testified that the road's shoulder where Wood pulled over was not safe for stopping and that Wood's pulling over before they activated their lights had concerned him. He explained,

> Well, usually when somebody does that, they're either trying to get us to go around them because they don't want to get stopped, they're trying to get us to leave them alone, or they're trying to set the arena for where the stop takes place if they want to run or if they want to, you know, throw something out or engage in some kind of physical altercation, they can set the location for that, not you.[6]

During the stop, Officer Brown ran the motorcycle's registration while Officer Richie spoke with Wood. Officer Brown testified that Wood had appeared very nervous, had been breathing heavily and talking rapidly, and had seemed very twitchy.

---

[6]During cross-examination, Officer Brown agreed that he and Officer Richie had not initially considered the stop to be high risk despite the prior day's dispatch.

During his direct testimony, Officer Brown testified that after Wood advised Officer Richie that he had a knife, Officer Richie told him that he was going to pat him down; Wood then became guarded and defensive, demanding to know what was going on.[7] Then Officer Richie told Wood that if he did not allow the pat-down, he was "gonna get [T]ased," and Wood ran. As they pursued him, Officer Brown yelled at Wood to show them his hands.

Wood pointed a gun toward them and fired shots, the first of which hit Officer Richie, who rolled into the ditch on the side of the road. Officer Brown fired back and dove for the ditch. Both returned fire. Officer Brown testified that in Wood's line of fire, there were cars and the woman on Wood's motorcycle. Officer Brown's body-camera video, which was admitted into evidence and published to the jury, supports his testimony about the stop sign, the stop, and the shooting.

_____

[7]During cross-examination, Officer Brown agreed that he did not recall whether Officer Richie actually told Wood that he was going to pat him down and agreed that Officer Richie had told Wood to turn around and then when Wood asked what was going on, Officer Richie told him, "[F]irst of all, turn around like I told you, today, not tomorrow." Officer Brown stated that the reason an officer might not tell someone that he is going to pat the person down is because "in their mind[,] they could be thinking am I gonna run, am I gonna do it, I have something that I don't want the police to know about. You know, there's a million things that could be going through somebody's mind."

Officer Richie testified that he did not tell Wood that he was going to pat him down. Instead, after Wood indicated that he had a knife in response to a question about whether he had any weapons, Officer Richie asked Wood to step up onto the roadway so that he could check him and to turn around. Officer Richie stated that at that point, Wood became defensive and started questioning what was going on.

When the prosecutor asked Officer Brown why he had returned fire as Wood fled, Wood objected during Officer Brown's answer, as set out below.

Q. Now, I notice here that you returned fire as he's running away; is that right?

A. Yes.

Q. Okay. And why do we -- what -- what's the purpose of that?

A. He had already attempted to shoot two police officers -- shot one police officer, attempted to shoot two. *He was running towards a neighborhood with people and a church. It was Sunday. There'[re] many occasions where people have been in a same exact situation, retreated to a neighborhood, murdered someone, taken their car.* [Emphasis added.]

[Defense counsel]: Judge, I'm going to object to [the] nonresponsive nature of that answer --

THE COURT: Sustained.

[Defense counsel]: -- and I'd ask the jury be instructed to disregard.

THE COURT: The jury -- the last part of the testimony just given, I'm instructing the jury to disregard that part of the testimony.

[Defense counsel]: Due to the inflammatory nature of this witness's answer, I request -- I respectfully request a mistrial, your Honor.

THE COURT: That would be denied.

During cross-examination, Officer Brown testified that Wood ran toward the church and the neighborhood, which he estimated had a dozen houses.[8] The trial

---

[8]The trial court also allowed defense counsel during cross-examination to ask Officer Brown about his improper destruction of personnel files and subsequent

court admitted into evidence photographs captured from the officers' body- and dashboard-camera footage. The trial court also admitted into evidence Defendant's Exhibit 21, an aerial photograph showing the area where Wood began running, which showed the neighborhood and the church in opposite directions. Texas Ranger Billy Hill later testified that as he investigated the officer-involved shooting, he canvassed the neighborhood and found a witness who told him that the suspect had stopped at his house and asked for water.

A mistrial should be granted in response to a witness's nonresponsive answer only in cases where that answer was "clearly calculated to inflame the minds of the jury or was of such damning character as to suggest that it would be impossible to remove the harmful impression from the jurors' minds." *Young v. State*, 283 S.W.3d 854, 878 (Tex. Crim. App. 2009). And, ordinarily, a prompt instruction to disregard will cure error associated with an improper question and answer, even one regarding extraneous offenses. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000). On appeal, we generally presume that the jury follows the trial court's instructions in the manner presented. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). The presumption is refutable, but the appellant must rebut the presumption by pointing to evidence that the jury failed to follow the trial court's instructions. *Id.*

---

reprimand during his time as interim police chief, as well as his employment record, which showed that he had worked for five or six police departments since 2009.

Here, the trial court gave an instruction to disregard Officer Brown's nonresponsive answer, and Wood does not direct us to any evidence that the jury failed to follow that instruction. *See id.* Further, the aerial photograph contradicted Officer Brown's testimony about the locations of the church and neighborhood, and the Ranger's subsequent testimony clarified that nothing Officer Brown feared had occurred. We overrule Wood's second issue.

### 2. Juror misconduct

Wood argues that an incident near the end of the trial's second day caused jurors to potentially receive evidence from outside the courtroom and that because the trial court refused to perform an inquiry, it cannot be determined from the record whether jury deliberations were compromised. The State contends that the trial court did not abuse its discretion by not questioning the jurors or declaring a mistrial when no evidence showed a Code of Criminal Procedure violation.

Outside the jury's presence, defense counsel informed the trial court that her intern, Amanda Arrington, had advised her that Deputy Victor Tran, who had worked at the jail when Wood was an inmate, along with Jailer Preston Wilson, Jail Administrator Daniel Armstrong, and Corporal Jaidan Saxon had violated the Rule[9]

---

[9]Commonly referred to as "The Rule," Rule of Evidence 614 provides that at a party's request, with some exceptions, the trial court "must order witnesses excluded so that they cannot hear other witnesses' testimony." *See* Tex. R. Evid 614.

and talked within the jury's earshot. She told the trial court that Arrington had told

her that all four witnesses

> were all sitting on the bench, which is roughly two to three feet from the
> jury door, discussing [Wood], discussing what a problem he was in the
> jail, and that they had issues with him every day, which is a violation of
> the Rule. It is within earshot of the jury, and the jury door was open and
> jurors -- at least one juror came outside and was on her phone, which
> moved her in even closer proximity to two -- to three witnesses that
> have previously testified[10] and one that is about to testify, your Honor.

The prosecutor replied that he had told them to make sure they kept their voices

down and that the State intended to rest.

Defense counsel then stated that the problem was that their conversation about

Wood had been "within earshot of the jury, and that is . . . information that's coming

to the jury . . . outside of the witness stand. And the door was open where the jury

could clearly hear, particularly when the one juror came outside and got on her

phone." She asked the trial court to "inquire of the jurors if anyone heard any of the

conversation out in the hallway."

The trial court replied,

> Okay. Well, at this point I am not going to -- I'm going to handle this by
> -- I will address it, but I'm not going to say, hey, blah, blah, blah, did you
> hear three people -- there were some deputies out there. Did you happen
> to hear what they were saying? I'm not gonna do that. So I'm not
> completely sure how I'm gonna do it . . . .

---

[10]Just before a break in the proceedings, Jailer Daniel Christie and Armstrong,
Wilson, and Tran had each testified about Wood's behavior as an inmate. The
prosecutor informed the trial court that Saxon had not yet been released but that he
did not necessarily intend to call her as a witness.

15

The prosecutor asked the trial court to instruct the jurors that they were not to consider anything they had not heard from the witness stand.

After the State rested, outside the jury's presence, the trial court allowed defense counsel to call Tran, Wilson, Saxon, Christie, and Arrington. Tran testified that he had been sitting on the bench outside the open door of the jury room full of jurors with Saxon and Wilson, but he denied that they had been talking about Wood or Wood's behavior in jail. He agreed that he had seen Arrington and that he believed that she was close enough to them to have heard their conversation.

Wilson testified that the prosecutor had instructed him and the other witnesses to sit in the jury room when not testifying but to leave the jury room when the jurors were using it. When the jury went to the jury room, he and the other witnesses sat in the hallway on a bench that was three or four feet outside of the jury room's open door. Wilson claimed that he and the other witnesses had been talking about the weather while they sat on the bench and had not been talking about their testimonies. He did not recognize Arrington and had not noticed her because he had been playing on his phone while the others were talking. He denied that any of the witnesses had been talking about Wood or his behavior in jail. Wilson agreed that if someone had said anything, the jurors could have heard it because the bench was only three feet away from the jury room's open door.

Saxon stated that she, Tran, Wilson, and Christie had sat or stood around the bench outside the jury room, where they talked with each other about work, the jail,

16

and a different inmate, not Wood. She agreed that the conversation had centered on someone at the jail being a problem and that the testimony that afternoon had been about Wood's jail conduct. She denied having heard any comments about Wood or about the defense's questions and how the defense was trying the case. Saxon agreed that she had seen Arrington.

Christie agreed that he had been sitting four or five feet outside the jury room with Saxon, Tran, and Wilson, within the jury's earshot. They had been talking about their work and problems in the jail, as well as a little about problematic inmates, but he did not recall a specific comment about someone being a problem in the jail. He agreed that they had not prefaced their conversations by stating that they were not talking about Wood. He said that they had not been speaking of any inmate specifically but rather about general problems with people in the jail.

Arrington, the defense intern, testified that she had been in the courtroom when Tran, Wilson, and Christie testified and that she had seen them, along with Saxon, seated on the bench outside of the jury room and had heard them talking. Regarding the conversation portion that stood out to her, Arrington stated that she overheard the following, which disturbed her:

> ["M]an, he was always a problem in the jail,["] you know, those kind[s] of comments. And they were sitting around like friends do, and they were laughing to each other; but it was clear to me that they were talking about [Wood]. And I think it was reasonable to assume that [to] anyone that was walking by, that they were talking about [Wood]. And I was disturbed that they were talking to each other at all. . . .

17

Arrington stated that although she did not hear them mention Wood's name, it was fair to assume from what she heard of their conversation that Wood was the discussion's topic. Arrington stated that they had been speaking very close to the jury room's open door. She identified a juror who had been nearby, within earshot and outside the room, who had been scrolling through her phone while leaning against the doorway. On cross-examination, Arrington agreed that she did not specifically hear Wood's name, that she was assuming he was the jailers' topic of conversation, and that she had eavesdropped for no more than four minutes. On redirect, she agreed that there was a temporal connection between the jailers' testimonies and the post-testimony conversation because those witnesses had just testified about Wood's jail conduct.

Defense counsel requested a mistrial, acknowledging that the consistent testimony had been that Wood's name was not mentioned but arguing that "it's a very clear assumption that anyone that overheard that conversation that did not hear the name of the individual they were speaking of would have assumed [that] they were speaking of" Wood. The trial court denied the request.[11] After both sides rested and

---

[11]The trial court also scolded the attorneys, stating,

> I think any officer of the court that thinks something is amiss going on in this courtroom or outside of it, certainly I want it called to my attention. . . . I do know if something is amiss, rather than sending somebody out to listen some more, . . . I would expect any officer of the court, any of you, to bring that directly to my attention.

closed, defense counsel offered, and the trial court admitted, six exhibits for record purposes—photographs showing the jury room and its distance from the bench.

A juror must make decisions during the guilt and punishment phases of trial using only information obtained in the courtroom: the law, the evidence, and the trial court's mandates. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Code of Criminal Procedure Article 36.22 prohibits anyone from conversing with a juror about a case on trial "except in the presence and by the permission of the court." Tex. Code Crim. Proc. Ann. art. 36.22. The paramount issue is whether the appellant received a fair and impartial trial. *Ocon*, 284 S.W.3d at 887.

If an Article 36.22 violation is proved, there is a rebuttable presumption of injury to the accused that may warrant a mistrial. *Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016). When determining whether the State sufficiently rebutted the presumption of harm, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its credibility determinations. *Id.* When evidence conflicts, the trial court does not abuse its discretion by overruling the motion for mistrial. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000).[12]

---

[12]In *Hughes*, two State's witnesses testified that they overheard a conversation between an assistant prosecuting attorney and a State investigator about an alleged discussion the assistant prosecuting attorney had with a juror sitting on the appellant's case. 24 S.W.3d at 841. The trial court held a hearing on the matter in which several individuals testified. *Id.* On the appellant's behalf, the two State's witnesses reiterated their claims that they had heard the assistant prosecuting attorney relate to the

Because mistrial is an extreme remedy, less drastic alternatives may suffice, such as instructing the jury to consider as evidence only the testimony and exhibits admitted through witnesses on the stand or questioning the jury about the extent of any prejudice. *Jenkins*, 493 S.W.3d at 612. That is, juror questioning is not a mandatory remedy under Article 36.22 or under Rule of Evidence 606(b), which permits—but does not require—juror testimony relating to improper outside influence. *Ocon*, 284 S.W.3d at 886;[13] *see* Tex. R. Evid. 606(b)(2).

As the State points out, the record does not reflect that anyone actually conversed with any jurors in violation of Article 36.22. Further, we cannot say that the

---

investigator her conversation with a male juror. *Id.* In response, the State called the investigator, his partner, a supervising prosecuting attorney, a prosecutor on the appellant's case, and the assistant prosecuting attorney at issue, who confirmed that the allegation was investigated but determined that no conversation or contact with a juror had taken place and that the State's witnesses had misunderstood. *Id.* at 841–42. At the hearing's conclusion, the trial court told defense counsel that it remained unconvinced of any improper conduct and denied the requests to examine the jurors in camera and to declare a mistrial. *Id.* at 842. The Court of Criminal Appeals held that there was no abuse of discretion in the trial court's decision not to investigate the matter further by conducting in camera examinations of individual jurors because the testimony conflicted about whether any improper communication had occurred. *Id.*

[13]In *Ocon*, during the trial's guilt–innocence phase, defense counsel overheard a juror in the men's room speak negatively about the aggravated-sexual-assault-of-a-child trial and its effect on his schedule while talking on his cell phone when another juror was in the restroom. 284 S.W.3d at 882. The trial court reminded the jury on four separate occasions during the guilt–innocence phase that they were not to talk about the case with anyone, and nothing indicated that those instructions had failed to remedy the situation. *Id.* at 883, 887. Further, although the juror spoke negatively about the appellant and the case, the appellant presented no evidence that the juror received any information as a result of the phone conversation. *Id.* at 887.

20

trial court abused its discretion here because it heard testimony from the jail witnesses and the intern and was entitled to resolve the facts based on its determination of their credibility even without questioning jurors about what they might have heard. *See Jenkins*, 493 S.W.3d at 612. And the trial court included an instruction in the jury charge that jurors were permitted to receive evidence "only in open court" and that "no juror is permitted to communicate to any other juror anything he or she may have heard regarding the case or any witness therein, from any other source than open court." Accordingly, we conclude that the trial court did not abuse its discretion by denying Wood's motion for mistrial, and we overrule his fourth issue.[14]

---

[14]We also note that to the extent any juror actually overheard the hallway conversation, it is unlikely that what was heard could have been measurably worse than what had already been presented on the stand about Wood's jail behavior. Armstrong, who had worked at the jail for nineteen years, testified about messages, threatening and otherwise, that Wood had sent from the jail on a county tablet that he paid a fee to use. Wood's messages stated, among other things, "[Don't think] I can't reach out and take[ ]a[ ]life from in here" and threatened to find out in discovery who had hurt his girlfriend and then find their parents and "scare the f-ck out of them . . . [and] then . . . break their f-cking bones real violent like [they] did to [his] gal."

Wilson testified that on November 26, 2021, Wood had refused to comply with instructions that his visitation was over and that it took three jailers to take him back to his cell, during which time Wood struck Tran in the face with his elbow, tried to bite Wilson, and injured Saxon, and a video of the altercation was admitted into evidence and published to the jury. Tran, who had just finished the police academy by the time of trial, also testified about that incident and said that there had been other incidents with Wood before that one. Tran also stated that Wood told him that when he saw him outside of the jail, he was going to "f-ck [Tran] up." Saxon was not called to testify.

## C. Cross-examination

In his third issue, Wood argues that the trial court erred by not allowing him to ask Officer Richie about prior police misconduct during cross-examination. Specifically, he complains that his rights were violated under the Sixth Amendment's Confrontation Clause and Rules of Evidence 608(a)(1) and 611(b). The State contends that Wood failed to preserve his Confrontation Clause argument and that the trial court did not otherwise abuse its discretion because the trial court could have reasonably concluded that Wood was attacking Officer Richie's character in general.

### 1. Background

At the beginning of Officer Richie's direct testimony, he listed the police departments where he had worked during his 23-year career. He stated that he had started his career in 1999, with "[a]lmost 11 months" with the City of Bridgeport Police Department, followed by the City of Runaway Bay from 2000 to 2013 and, before leaving Runaway Bay to work for the City of Boyd Police Department, he had been Runaway Bay's interim police chief. The prosecutor then asked how he was appointed as interim police chief, and Officer Richie replied that the city council had voted him in. Officer Richie testified that he left the City of Boyd at the rank of assistant police chief to begin working for the City of Rhome and that he had worked for Rhome for a little over two weeks before the June 13, 2021 shooting. He was still working for Rhome's police department at the time of the trial.

After Officer Richie's direct testimony and outside the jury's presence, Wood's defense counsel argued that the prosecutor's eliciting testimony that a city council had voted, or vouched, for the type of officer that he was had put the officer's character and caliber as a police officer into issue. The trial court asked, "Well, is that Runaway Bay?" The prosecutor replied, "Yeah. That was many years ago." The trial court then overruled defense counsel's request, stating, "I don't know why . . . it was brought up that the city council would have put him in that position, but I don't think that opens the door to anything that would be relevant in punishment that we're in." Wood's counsel asked the trial court to "at some point . . . put in the copies of the investigation and the decisions made by the various police departments for purposes of the record and preserving [the] objection," and the trial court stated that it would allow her to do so.

Before trial resumed on the last day, defense counsel offered, and the trial court accepted for the record, the items she had wanted to use during cross-examination. The excluded items are from the Bridgeport and Boyd Police Departments. There are no reports from Runaway Bay or Rhome.

The first Bridgeport report is an August 23, 2000 neglect-of-duty report issued for Officer Richie's August 18, 2000 failure "to submit his citations for the day prior to going end of watch," which was contrary to standard policy, and which led to an August 22, 2000 complaint about a citation that had not been entered into the

23

department's computer system. At the time, he had been with the department for nine months; he was put on probation and received an official reprimand.

The second Bridgeport report is a September 1, 2000 complaint about conduct unbecoming an officer based on Officer Richie's August 31, 2000 taunting of an inmate on mental-health watch when he transported a prisoner to jail for booking; the complaint led to his suspension with pay a few days later, and ultimately his resignation in lieu of termination a few days after that. The accompanying evaluation noted that Officer Richie had established a pattern of unprofessional behavior and that complaints "started to come from citizens throughout the [C]ity of Bridgeport."

The Boyd report is an April 8, 2021 investigation that resulted in a finding that on March 2, 2021, Officer Richie, as assistant police chief, had violated the emergency-vehicle-response policy, which required that no officer drive over 15 miles per hour or more over the posted speed limit (25 miles per hour) while running Code 2, and that he had violated the professional conduct code. Officer Richie was placed on administrative leave with pay during the investigation and then issued immediate termination of employment upon its conclusion a week later.

### 2. Preservation

Generally, a defendant forfeits a constitutional error by failing to object on that basis at trial. *Golliday v. State*, 560 S.W.3d 664, 670–71 (Tex. Crim. App. 2018); *Anderson v. State*, 301 S.W.3d 276, 279–80 (Tex. Crim. App. 2009). This is because the trial court "should know when it is being asked to make a constitutional ruling," as

24

constitutional error is subject to a much stricter harm analysis on appeal. *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012). "The court needs to be presented with and have the chance to rule on the specific constitutional objection because it can have such heavy implications on appeal." *Id.* Because it is not apparent on this record that Wood raised a Confrontation Clause objection, *see* Tex. R. App. P. 33.1, we overrule this portion of his fourth issue.

### 3. Other evidentiary objections

We review the trial court's decision on the admissibility of evidence for an abuse of discretion. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016). A trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement, and if its evidentiary ruling is correct under any applicable theory of law, it will not be disturbed even if the trial court gave an incorrect or insufficient reason for the ruling. *Id.* Further, if the trial court abused its discretion, we will not reverse its judgment unless the error affected a substantial right of the appellant, that is, unless the error had a substantial and injurious effect or influence in determining the jury's verdict. *See* Tex. R. App. P. 44.2(b); *Bosquez v. State*, 446 S.W.3d 581, 585 (Tex. App.—Fort Worth 2014, pet. ref'd).

### a. Rule of Evidence 608

Under Rule of Evidence 608(a), a witness's credibility may be attacked by testimony about his reputation for having a character for truthfulness or untruthfulness or by opinion testimony about that character, but such evidence is

admissible only after the witness's character for truthfulness has been attacked. Tex. R. Evid. 608(a). Under Rule of Evidence 608(b), except for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct to attack or support his character for truthfulness. Tex. R. Evid. 608(b). The record does not reflect that anyone attacked Officer Richie's character for truthfulness; accordingly, the trial court did not abuse its discretion by denying admission of the employment records on this basis, and we overrule this portion of Wood's third issue.

### b. Rule of Evidence 611

Under Rule of Evidence 611(a), the trial court should exercise reasonable control over the mode and order of examining witnesses and presentation of evidence to make those procedures effective for determining the truth, to avoid wasting time, and to protect witnesses from harassment or undue embarrassment. Tex. R. Evid. 611(a). A witness may be cross-examined on any relevant matter, including credibility. Tex. R. Evid. 611(b). The Rules of Evidence generally permit a defendant to cross-examine a witness for his purported bias, interest, and motive without undue limitation or arbitrary prohibition. *Johnson*, 490 S.W.3d at 910.

While none of the employment records cast Officer Richie in a particularly favorable light, none of them appear to have any bearing on his credibility regarding Wood's having shot him in the foot. To the contrary, the dashboard- and body-camera footage established what happened at the scene, and medical testimony by an

orthopedic surgeon confirmed that Officer Richie had been shot in the foot. Accordingly, we conclude that the trial court did not abuse its discretion by excluding the evidence on this basis, and we overrule the remainder of Wood's third issue.

## D. Mitigation evidence

In his fourth issue, Wood argues that he should have been allowed to present evidence that he was held in pretrial solitary confinement "in violation of state [jail] and Wise County Jail standards" because he had a constitutional right to present evidence designed to mitigate his punishment. Wood contends that this evidence would have shown that his "pre-trial confinement had been oppressive" and would have countered the "great lengths" to which the State went to punish him "based partly on his behavior while at the Wise County Jail awaiting trial." The State responds that the trial court did not abuse its discretion because the trial court could have reasonably found that the evidence was irrelevant to sentencing or was properly excluded.

### 1. Background

During Armstrong's testimony, Wood's counsel attempted to introduce evidence that jail disciplinary hearings could be recorded, and the prosecutor objected to relevance. The trial court asked Wood's counsel to explain the relevance, and she replied, "[M]y client has been held in solitary confinement since November the 26th of 2021," which she argued was contrary to the Inmate Handbook's terms, which

allowed for no more than 30 days' solitary confinement for an infraction. At that

point, the trial court excused the jury from the courtroom.

As soon as the jurors departed, the following colloquy occurred:

> THE COURT: All right. Outside the presence of the jury, [Defense counsel], I cannot imagine why any disciplinary hearing information would be relevant to how the jury decides punishment should be rendered in this case, so I don't understand where you're going with this.

> [Defense Counsel]: Your Honor, it's our position that my client has been held in solitary confinement in violation of the rules and standards of Texas law and the Wise County Sheriff's Handbook. I do not have, and I've subpoenaed all the records, disciplinary hearing records that would support a consecutive 30-day confinement in contradiction to the handbook from November the 26th through 2021 [sic]. It is certainly mitigation. We believe it's mitigation to show the way he has been treated in jail in that his rights have been violated by being held in solitary confinement in violation of the law and of their own rules.

Defense counsel then added that she doubted the hearings had taken place and that

was why she had asked if there were any recordings and that it went to the bias of the

jail staff called by the prosecutor. The trial court sustained the prosecutor's objection,

finding that the information was not relevant, but it allowed defense counsel to ask

Armstrong whether he had been asked to provide jail video that would have shown an

earlier witness's listening to Wood's conversation with another inmate through the

"toilet phone."[15]

---

[15]Deputy Seth Sirman, a jailer in July 2021, testified that Wood had been in a segregation cell on the same side of the hallway as another inmate with whom he could communicate by shouting into the toilet plumbing, i.e., the "toilet phone."

28

Before the jury, defense counsel asked Armstrong to identify who had requested the November 26, 2021 jail video (the day Wood fought with Tran, Wilson, and Saxon), and he replied that the DA's investigator had requested it. She then asked Armstrong whether he had been asked to provide video from July 10, 2021, showing where Deputy Sirman might have been in the jail, and he replied, "No, ma'am." After the jury had been dismissed for the day, defense counsel offered the Wise County Inmate Handbook that "includes, among other things, the punishments for both a major infraction and a minor infraction." The trial court added the exhibit to the other court exhibits entered for record purposes.

Defense counsel stated that the testimony she would have elicited would have been that even with a major infraction that resulted in an indictment, "an individual cannot be held in solitary confinement for anything greater than 30 days" and that Wood "has been held in solitary confinement" from November 26, 2021, to August 18, 2022. The prosecutor replied, "[W]e are not stipulating that he's been in solitary that entire time, because I know there have been times where he has been put back in general population and then returned to solitary." During the defense's case, Wood's mother agreed that Wood had been in solitary confinement for many months, but she did not state for how long or whether it was continuous. No one produced any

_____

Deputy Sirman testified that on July 10, 2021, he heard Wood say over the toilet phone, "[W]hen I shot that cop, I was aiming for his head. The only reason he's alive today is by my grace."

evidence regarding the effect of solitary confinement on inmates generally or on Wood in particular.

## 2. Law on punishment evidence

During punishment, "evidence may be offered by the [S]tate and the defendant as to any matter the court deems relevant to sentencing, including but not limited to" the defendant's prior criminal record, general reputation, and character; the circumstances of the offense for which he is being tried; and—notwithstanding Rules of Evidence 404 and 405[16]—any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act. Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1).

Evidence is "relevant to sentencing" under Article 37.07 if it is "helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Beham v. State*, 559 S.W.3d 474, 479 (Tex. Crim. App. 2018). In *Beham*, the court discussed punishment-phase facts, which come in two varieties—normative facts and subsidiary facts. *Id.* at 480. Normative facts are those that directly impact the factfinder's normative response to the defendant, such as evidence beyond a

---

[16]Rule of Evidence 404 addresses limitations on evidence of character, crimes, and other acts, and Rule of Evidence 405 addresses methods of proving character. *See* Tex. R. Evid. 404–405.

reasonable doubt that the defendant committed an extraneous criminal offense—a clear basis upon which a jury could legitimately form a clearer opinion of the proper punishment for the defendant's conduct. *Id.* Subsidiary facts, on the other hand, are facts that are relevant insofar as they assist in proving or disproving a normative fact, such as eyewitness testimony pertaining to the extraneous offense, an alibi, or evidence of a witness's credibility. *Id.*

A normative fact's admissibility depends on the bounds placed by the Legislature or Constitution on what a jury may properly consider in sentencing, and within these policy-defined bounds, the trial court has wide discretion to deem virtually any matter relevant to a proper sentence. *Id.* But the relevance of a particular subsidiary fact is governed by Rule of Evidence 401, that is, whether it has any tendency to make more or less probable the existence of a normative fact properly at issue in the case. *Id.* at 480–81; *see* Tex. R. Evid. 401.

In *Beham*, when the defendant willingly displayed on Facebook photographs of himself posing with drugs and pointing a handgun at the camera, testimony that the materials appeared in context to be celebratory of the gang lifestyle, or at least gang-related, allowed the jury to better understand the defendant's decision to promote them and was thus normatively relevant to the jury's determining a proper punishment for his crime of aggravated robbery. 559 S.W.3d at 483–84; *see also Watkins v. State*, 619 S.W.3d 265, 290–91 (Tex. Crim. App. 2021) (noting that collection of booking records, pen packets, and judgments of prior convictions used

to prove two prior convictions for enhancement and other extraneous offenses were at least "subsidiary" facts that could assist the factfinder in finding normative facts such as the prior offenses' commission and thus should have been disclosed upon a proper Article 39.14 discovery request).

Likewise, the Court of Criminal Appeals has held that a trial court could reasonably conclude that evidence offered to show that a defendant had committed aggravated perjury during his trial's guilt–innocence phase would be helpful to the jury in determining the appropriate sentence. *McGee v. State*, 233 S.W.3d 315, 318 (Tex. Crim. App. 2007) (noting, per *United States v. Grayson*, 438 U.S. 41, 50, 98 S. Ct. 2610, 2616 (1978), that a defendant's truthfulness or mendacity while testifying on his own behalf is relevant to sentencing). On the other hand, evidence that would exonerate the defendant is not admissible during a trial's punishment phase to relitigate his or her guilt. *Id. Compare Stiehl v. State*, 585 S.W.2d 716, 718 (Tex. Crim. App. [Panel Op.] 1979) (stating, in construing an earlier, narrower version of Article 37.07, that appropriate factors had in common a relationship to the offense's circumstances or the defendant before or at the time of the offense, and that factors arising after the offense and independently of the defendant should not be allowed in evidence in mitigation of punishment, including the defendant's pretrial confinement circumstances, which had nothing to do with the offense or any statutory mitigating factors), *with Contreras v. State*, 59 S.W.3d 362, 365 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (noting that Article 37.07 was amended post-*Stiehl* to make admissible

32

"any matter the court deems relevant to sentencing," including evidence arising after the offense).

The sentencing process consists of weighing mitigating and aggravating factors and adjusting the sentence's severity consistent with this calculus. *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). The admissibility of punishment-phase evidence that the trial court deems relevant is subject to a Rule 403 analysis. *See Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999) (holding trial court did not abuse its discretion when the Court of Criminal Appeals could not say as a matter of law that the probative value of the length of the defendant's prior sentences was substantially outweighed by the danger of unfair prejudice).

### 3. Wood's excluded evidence

The Inmate Handbook sets out 47 rules and regulations. It lists Rule 4—no fighting, with or without weapons—as a major infraction subject to the highest disciplinary severity. It further states that "[i]nmates who violate any jail rule may have disciplinary action taken against them" that may result in disciplinary segregation by "confinement in single-cell separation for up to 30 days." The handbook does not state a limitation on consecutive violations. The handbook also sets out the disciplinary procedure—including written charges and a hearing if the charges are referred to the disciplinary board, where the inmate "will be allowed to call any

witnesses, present documentary evidence or seek the aid of other inmates or staff to assist in the inmate's defense."

Wood did not put on any evidence to support his counsel's assertion that he had been in solitary confinement since November 26, 2021, and the prosecutor did not put on any evidence to support his countervailing assertion that Wood had been in and out of solitary confinement. Neither party put on any evidence regarding the existence or absence of any disciplinary hearings[17] or any evidence about the general effects of solitary confinement or its particular effects on Wood that might have contributed to his jail behavior. *Cf. Ex parte Jennings*, 662 S.W.3d 379, 394 (Tex. Crim. App. 2018) (Alcala, J., concurring and dissenting) (stating that solitary confinement "appears to have serious psychological and physical effects on human beings. When the amount of time in this type of confinement reaches about thirty years, as here, I can conceive of these conditions possibly becoming cruel and unusual punishment."); 58 Tex. Jur. 3d Penal & Correctional Institutions § 82 (2023) ("[A]lthough administrative segregation of prisoner[s] is not per se or necessarily unconstitutional, segregated confinement may violate the constitutional prohibition against cruel and unusual punishment if it is extremely disproportionate, arbitrary, unnecessary, or without sufficient penological justification."); 1 Rights of Prisoners § 3:20 (5th ed.

_____

[17]Although Wood's counsel asserted that she had subpoenaed the "disciplinary hearing records," she did not put into evidence her subpoena or anything that it had produced.

34

2023) (listing common psychiatric symptoms among isolated inmates to include perceptual distortions, hyperresponsivity to external stimuli, and problems with impulse control).

### 4. Analysis

Based on the above, we cannot say that the trial court abused its discretion by finding the Inmate Handbook irrelevant as mitigation evidence because nothing was provided to draw a connection between the effect of Wood's treatment in prison with the jury's assessment of punishment.[18] Without such subsidiary and normative facts to connect the dots between Wood's behavior while awaiting trial, his time in solitary confinement while awaiting trial, and his ultimate punishment for shooting Officer Richie in the foot and shooting at Officer Brown, the trial court had no basis on which to conclude that such evidence would be relevant in sentencing. *Cf. Rose v. State*, No. 02-21-00178-CR, 2023 WL 308170, at *11 (Tex. App.—Fort Worth Jan. 19, 2023, no pet.) (mem. op., not designated for publication) (discussing mitigation evidence in ineffective-assistance context and quoting *Sears v. Upton*, 561 U.S. 945, 954–56, 130 S. Ct. 3259, 3266 (2010), for the proposition that there is no prejudice when the

---

[18]In comparison, in *Stiehl*, the defendant had prevailed in a federal suit alleging a violation of his rights because of his pretrial-confinement conditions. 585 S.W.2d at 717. The court concluded that this information was properly excluded as evidence in mitigation of punishment because it was "properly the subject of an entirely separate action." *Id.* at 718.

mitigating evidence "would barely have altered the sentencing profile presented to the decisionmaker"). Accordingly, we overrule Wood's fourth issue.

### III. Conclusion

Having overruled all of Wood's issues, we affirm the trial court's judgments.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: October 26, 2023

36